**GUTRIDE SAFIER LLP**
ADAM J. GUTRIDE (State Bar No. 181446)
SETH A. SAFIER (State Bar No. 197427)
ANTHONY PATEK (State Bar No. 228964)
KRISTEN SIMPLICIO (State Bar No. 263291)
100 Pine Street, Suite 1250
San Francisco, California 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469
adam@gutridesafier.com
seth@gutridesafier.com
anthony@gutridesafier.com
kristen@gutridesafier.com

**THE EUREKA LAW FIRM**
UREKA E. IDSTROM (*pro hac vice*)
5605 Belinder Road
Fairway, KS 66205
Telephone: (816) 665-3515
uidstrom@eurekalaw.com

*Attorneys for Plaintiffs and the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| JENNIFER ZIZUMBO, CHANDRA ZUNDEL, and ADRIANNE ORDAZ, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UNILEVER UNITED STATES, INC., UPFIELD US INC. (formerly known as UNILEVER BSC US INC.); AND UPFIELD SOURCING US, INC. (formerly known as UNILEVER BSC SOURCING US, INC.). Delaware corporations,<br><br>Defendants. | Case No. 4:18-cv-07213-JSW Related to: 4:13-cv-01675-JSW<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT** |

Plaintiffs Jennifer Zizumbo, Chandra Zundel, and Adrianne Ordaz bring this action on behalf of themselves and all others similarly situated against Unilever United States, Inc.; Upfield US Inc. (formerly known as Unilever BSC US Inc.); and Upfield Sourcing US, Inc. (formerly known Unilever BSC Sourcing US, Inc.) (collectively, "Defendants"). Plaintiffs' allegations against Defendants are based upon information and belief and upon investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based upon Plaintiffs' personal knowledge.

## I.     OVERVIEW

1.     Defendants engage in false, unfair and deceptive practices in advertising, marketing, and selling I Can't Believe It's Not Butter! Spray ("ICBINB Spray"). Defendants label, market, and sell ICBINB Spray as containing "0 calories" and "0g fat" when in fact ICBINB Spray contains 1160 calories and 124 grams of fat per 12-ounce bottle. As part of their scheme to deceive consumers, and in violation of California's Sherman Food, Drug, and Cosmetic Act, which incorporates the Food and Drug Administration's regulations, Defendants use unreasonably small "serving sizes" that fail to account for the manner in which consumers actually use ICBINB Spray and failed to incorporate a statement of identity disclosing in simple and direct terms that ICBINB is 40% vegetable oil. Consumers, who are increasingly health conscious and interested in calorie-free and fat-free food alternatives for themselves and their families, are deceived by Defendants' practices.

## II.     PARTIES

2.     Plaintiff Jennifer Zizumbo is, and was at all relevant times, an individual and resident of California. Ms. Zizumbo currently resides in San Diego, California.

3.     Plaintiff Chandra Zundel is, and was at all relevant times, and individual who has resided in several states since 2004. Ms. Zundel has resided in Escondido, California since 2010.

4.     Plaintiff Adrianne Ordaz is, and was at all relevant times, an individual and resident of California. Ms. Ordaz currently resides in Altadena, California.

5.      Defendant Unilever United States, Inc. ("Unilever Parent") is a for-profit, Delaware corporation with its principal place of business in Englewood Cliffs, New Jersey.

6.      Defendant Upfield US, Inc. ("Upfield") is a for-profit, Delaware corporation with its principal place of business in Englewood Cliffs, New Jersey. It is also utilizes the name Unilever BCS US Inc. Records filed in the state of Delaware show that on July 18, 2018, Unilever BCS US, Inc. changed its name to Upfield US Inc. As of January 10, 2019, the Secretary of State for the state of New York showed that Unilever BCS US was still the official name of the business. Neither entity is registered to do business in California.

7.      Defendant Upfield Sourcing US, Inc. ("Upfield Sourcing") is a for-profit, Delaware corporation with its principal place of business in Englewood Cliffs, New Jersey. It is also utilizes the name Unilever BCS Sourcing US, Inc. Records filed in the state of Delaware show that on July 18, 2018, Unilever BCS Sourcing US, Inc. changed its name to Upfield Sourcing US Inc. As of January 10, 2019, the Secretary of State for the state of New York showed that Unilever BCS US was still the official name of the business. Neither entity is registered to do business in California.

8.      The true names and capacities of Defendants sued as Does 1 through 50, inclusive, are unknown to Plaintiffs. Plaintiffs will seek leave of Court to amend this Class Action Complaint when said true names and capacities have been ascertained.

9.      The Parties identified in paragraphs 5-7 of this Class Action Complaint are collectively referred to hereafter as "Defendants." The Parties identified in paragraphs 6-7 are collectively referred to hereafter as "Upfield Defendants."

10.      Unilever Parent exclusively owned and controlled the "I Can't Believe It's Not Butter" intellectual property and products until at least April 22, 2015. In or around April 2015, responsibility for the "I Can't Believe It's Not Butter" intellectual property and products became shared between Unilever Parent and the Upfield Defendants.

11.      At all times herein mentioned, Defendants, and each of them, were members of, and engaged in, a joint venture, partnership and common enterprise, and acting within the course and scope of, and in pursuance of, said joint venture, partnership, and common enterprise.

12.      At all times herein mentioned, the acts and omissions of Defendants, and each of

them, concurred and contributed to the various acts and omissions of each and all of the other Defendants in proximately causing the injuries and damages as herein alleged.

13.    At all times herein mentioned, Defendants, and each of them, ratified each and every act or omission complained of herein. At all times herein mentioned, the Defendants, and each of them, aided and abetted the acts and omissions of each and all of the other Defendants in proximately causing the damages, and other injuries, as herein alleged.

### III.    JURISDICTION AND VENUE

14.    This Court has personal jurisdiction over Plaintiffs because they each submit to the Court's jurisdiction. This Court has personal jurisdiction over each Defendant because it conducts substantial business in the District and thus has sufficient minimum contacts with Alameda County and California.

15.    Venue is proper in Alameda County because Unilever conducts substantial business in this county, including maintaining a sales office in Pleasanton, California.

### IV.    FACTUAL ALLEGATIONS

**A.    Defendants Market I Can't Believe It's Not Butter Spray as a Butter Substitute.**

16.    I Can't Believe It's Not Butter! is the second largest margarine/spreads brand in the U.S., with annual retail sales in excess of $300 million dollars.[1] Defendants sell various versions of ICBINB, including versions packaged in plastic tub containers, "all-purpose sticks" that look like sticks of butter, and the ICBINB Spray, which is contained in pump-action squirt bottles. Defendants have manufactured and distributed ICBINB Spray since 1994. Defendants marketed two kinds of ICBINB Spray: the original flavor, which is still being sold today, and an olive oil flavor, which Defendants ceased the sale of in approximately 2017 or early 2018. This case focuses

---

[1] I Can't Believe It's Not Butter!, http://www.unileverusa.com/brands-in-action/detail/I-Can-t-Believe-It-s-Not-Butter--/285856/?WT.contenttype=view%20brands (last visited August 7, 2013); https://web.archive.org/web/20150413084248/http://www.unileverusa.com:80/brands-in-action/detail/I-Can-t-Believe-It-s-Not-Butter--/295856/?WT.contenttype=view%20brands (last visited September 17, 2018); *see also* https://www.nytimes.com/2005/07/26/business/i-cant-believe-its-not-a-tv-ad.html ($243M brand sales in 2005).

solely on the original flavor ICBINB Spray, and as used herein, "ICBINB Spray" refers only to the original flavor, except where otherwise specified.

17.    Defendants understand that obesity is a rising health epidemic and that consumers,concerned about their health and appearance, are willing to pay more for products with reduced fat and calories.

18.    Accordingly, Defendants have embarked on a long term advertising campaign to trick the public into believing that the various I Can't Believe It's Not Butter! products (including ICBINB Spray) are a healthier alternative to butter. For example, the ICBINB website, icantbelieveitsnotbutter.com,[2] states that the ICBINB products have "the delicious, rich and creamy unbelievable taste you love. And with 0g trans fat per serving, no cholesterol and no partially hydrogenated vegetable oils, you know that taste is rooted in goodness."[3]

19.    As part of their long term advertising campaign, Defendants have encouraged consumers to use ICBINB Spray as fat-free, calorie-free butter substitute since its launch over two decades ago. The name of the product itself—"I Can't Believe It's Not Butter"—suggests to the consumer that the product is intended to be a diet version or substitute for butter and margarine products (including other products in the I Can't Believe It's Not Butter line), albeit one without any fat and calories. And since its launch and continuing through the class period, Defendants have utilized words and imagery to inspire consumers to replace their butter and margerine with a substitute that is purportedly lower in calories and fat, while still getting the taste of butter. For example, on some packages, Defendants have stated that ICBINB Spray has "Delicious Butter Taste" and on others, they have stated "America's Favorite Buttery Spray." Another states "Spray on Delicious Butter Taste!" Similarly, the older version of the product's label depicts ICBINB Spray being used as a topping for corn on the cob—a role traditionally reserved for butter.

20.    Some examples of the product's front labels in use during the class period are

_____

[2] The website is currently operated by the Upfield Defendants. However, the website was created by Unilever and was operated by Unilever until July 2, 2018. Accordingly, on information and belief, each Defendant is responsible for the statements on the website.

[3] http://www.icantbelieveitsnotbutter.com/campaigns/our-story/ (last visited September 17, 2018).

1  featured below:




21.    At all times during the class period, the front of the packaging for the ICBINB

Spray advertised that the product contained zero calories and zero trans fat. At all times during the

class period, the formulation of the ICBINB Spray was the same.

22.    At all times during the class period, the back of the labels of the ICBINB Spray,

along with all ICBINB branded products, identified the company as "Unilever" and noted that it

1    was located in Englewood, New Jersey.



5    The backs of the ICBINB Spray packages have never included any language to assist consumers in

6    determining which Unilever entity (or Upfield Defendant) is responsible for marketing the product.

7    As recently as January 9, 2019, "I Can't Believe It's Not Butter" products being sold in California

8    continued to display "Unilever" on the package.  None of the Defendants appear to have ever

9    registered "Unilever" as a registered D/B/A in the state of California.

10           23.    Notably, for years, Defendants have advertised that ICBINB Spray can be used for

11   "topping" and "cooking." To that end, Defendants have for many years used the ICBINB website

12   to feature various recipes that call for the use of ICBINB, including ICBINB Spray, instead of

13   butter. For example, the ICBINB website encourages consumers to use ICBINB Spray instead of

14   butter for grilled vegetables, as topping for popcorn and as a spread for muffins and toasted bread.

15           24.    Since the launch of the product, and at all times during the class period, Defendants

16   have advertised on the front of the ICBINB Spray package that product has "0 Calories" and "0g

17   Trans Fat." *See* Paragraphs 20-21.

18           25.    Throughout the class period and until approximately mid-2018, the ICBINB Spray

19   front label states that the product has "0 CALORIES PER 1 SPRAY," and "0g Trans Fat Per

20   Serving*," with the asterisk pointing to text stating either "SEE NUTRITION INFORMATION

21   FOR FAT, SODIUM AND SERVING SIZE" or "SEE NUTRITION INFORMATION FOR FAT

22   CONTENT AND SERVING SIZE." This text appeared in font less than one-sixteenth inches tall,

23   all capitalized, and with awkward spacing that ensured it would be difficult to notice much less

24   understood while the asterisk appeared smaller than a period on this printed page.

25           26.    Defendants know that consumers are unlikely to see the asterisk, much less follow it

26   to the back of the package. But to further confuse those that do, for years, and throughout the class

27   period, Defendants have used a confusing back of the package format to obscure the fact that the

28   product does actually have fat and calories.

27.     Examples of the back of the ICBINB Spray in use by Defendants can be found here:





28.     Defendants purport to intend to alert consumers to a disclaimer on the back of the

package which states "*ADDS A DIETARILY INSIGNIFICANT AMOUNT OF FAT." This

statement does not cure the deception, but rather reinforces the confusion, because it does not disclose that when used at a standard serving size of one tablespoon, the product does contain a significant amount of fat.

29.    Of course, few consumers will notice the asterisk, much less scan through lots of small print to figure out what it means. Defendants know this, and utilize a deceptive nutrition panel to further mislead even those consumers who check the back of the package to see if it comports with the representations on the front. In particular, for years and until mid-2018, Defendants listed nutritional information for two different "serving sizes": (1) one spray, or .20 grams, which Defendants described as the "Cooking Spray" serving size and (2) five sprays, or 1 gram, which Defendants describe as the "Topping" serving size. After that point, Defendants merely listed nutritional information for a one spray serving size.

30.    For years, and throughout the class period, Defendants have represented that both "serving sizes" contain zero calories, and zero grams of fat, and that the amount of fat and calories makes up "0%" of one's daily value, regardless of whether the product is used as a cooking spray or a topping.

31.    ICBINB is sold in refrigerated sections of grocery stores beside butter and other buttery flavored toppings (e.g., ICBINB spread), rather than on unrefrigerated shelves with cooking sprays such as Pam. The label for the 8 oz. bottle states "refrigerate for quality."

32.    The ICBINB Website makes the same claims about there being no fat or calories per serving:

- **0g fat per serving**

- **0 calories per serving**

- **0g trans fat per serving**

*I Can't Believe It's Not Butter!® Spray contains 0g fat, 0g trans fat and 0 calories per 5 sprays.
**When used as a topping, the amount of sodium per serving is 15mg, 1% of the daily value of sodium (less than 2400mg).

(http://www.icantbelieveitsnotbutter.com/product/detail/129811/original-butter-spray, last accessed on August 17, 2018.)

33.    Defendants' representations on the ICBINB Spray labels and on the ICBINB website are designed to trick consumers into believing that they can use ICBINB Spray as a butter substitute and not ingest any calories or fat. But that is not the case. In reality, ICBINB Spray contains 1160 calories and 124 grams of fat per 12-ounce bottle, and 773 calories and 81.3 grams of fat per 8-ounce bottle.

**B.    Defendants' Chosen Serving Sizes Violate FDA Regulations.**

34.    In an attempt to justify their false 0-calories and 0-fat representations, Defendants chose to use unreasonably small serving sizes for ICBINB Spray. Specifically, the back labels of the 12-oz bottle provide two serving sizes: (i) "1 spray" (when used as a "cooking spray"); and (ii) "5 sprays" (when used as a "topping"). Because ICBINB is 40% fat, each "spray" contains 0.8 calories and 0.08 grams of fat, 5 sprays contains 4 calories and 0.4 grams of fat. With respect to both serving sizes, Defendants nevertheless rounded the calories and fat down to zero for the purposes of the ICBINB Spray label and ICBINB Spray marketing.

**1.    Overview of the Food and Drug Administration's Serving Size Regulations**

35.    The Food Drug and Cosmetic Act ("FDCA") regulates the proper labeling of food. 21 U.S.C. §§ 301 *et seq*. It also vests the Food and Drug Administration ("FDA") with the authority to "protect the public health by ensuring that foods are safe, wholesome, sanitary, and properly labeled." 21 U.S.C. § 393(b)(2)(A). The FDCA has been independently adopted as part of the Sherman Food, Drug and Cosmetic Law, California Health and Safety Code ("Cal. Health & Saf. Code") § 109875, *et. seq. See* Cal. Health & Saf. Code §§ 110100(a), 110380, 110505 (adopting FDA standards).

36.    Pursuant to this authority, the FDA has promulgated a comprehensive set of regulations pertaining to labeling requirements. 21 C.F.R. §101.1 *et seq*. These regulations require a manufacturer to disclose the total number of calories and fat per serving on the labeling of a food product. 21 C.F.R. §101.9(c).

37.     21 U.S.C. §343(q) governs the disclosure of nutrition information on a product label. It deems a food misbranded unless its label or labeling discloses the total number of calories per serving and the amount of fat per serving. *See also* 21 C.F.R. §101.9(c)(1-2).

38.     Manufacterers are not permitted to select a serving size at random. Rather, the FDA has detailed regulations about how they must be chosen. In particular, the FDA has prescribed serving sizes for 131 product categories "to assure that nutrition labels on similar types of foods are consistent, so that consumers will be able to easily and readily make comparisons of nutrient content among products." 55 F.R. 29517. The FDA's 131 product categories are set forth at 21 C.F.R. § 101.12, Table 2 ("Serving Size Table"). For each product category set forth in the Serving Size Table, the FDA has designated a standard serving size that manufacturers are to use.

39.     To further ensure uniformity and make it so customers can easily compare the nutritional information across like products, the FDA requires all food manufacturers to choose one "reference" category from the Serving Size Table and use the corresponding serving size for determining the per-serving nutritional information . That reference category must be based upon the product's major intended use. 21 C.F.R. §101.12(a)(7). And the regulations define a "serving" as the amount of food "customarily consumed" per eating occasion, which must be "based on consumption data under actual conditions of use." 21 C.F.R. §101.9(b)(1). Moreover, the FDA regulations further state that substitute products, such as a "low calorie" version, have to use the same serving size "as the food for which it is offered as a substitute." 21 C.F.R. § 101.12(d). Substitute products are those that "may be used interchangeably with another food that it resembles, i.e., that it is organoleptically, physically, and functionally (including shelf life) similar to" the other product. 21 C.F.R. 101.13(d).

40.     If a manufacturer is unable to select any of the reference categories from the Serving Size Table, it must contact the FDA with evidence to support its serving size to have its serving size approved. *See* 21 C.F.R. §101.12(h); 58 F.R. 2273.

**2.     Defendants Were Required by the FDA to Select a 1 Tablespoon Serving Size.**

41.     Here, Defendants ignored these FDA regulations and intentionally selected the wrong serving size.

42.    The relevant section of the Serving Size Table is below:

| Fats and Oils: | | |
|---|---|---|
| Butter, margarine, oil, shortening | 1 tbsp | 1 tbsp (_g); 1 tbsp (15 mL) |
| Butter replacement, powder | 2 g | _tsp(s) (_g) |
| Dressings for salads | 30 g | _tbsp (_g); _tbsp (_mL) |
| Mayonnaise, sandwich spreads, mayonnaise-type dressings | 15 g | _tbsp (_g) |
| Spray types | 0.25 g | About _seconds spray (_g) |

43.    As the table illustrates, within the "Fats and Oils" reference category, there are various subcategories, including the default, "Butter, margarine, oil and shortening." Manufacturers must use the defaulted serving size of one tablespoon for any "Fat and Oil" unless the product fits within a more specific subcategory. Moreover, the FDA has provided guidance on what these categories mean. In Attachment 26 to the Guide to Nutrition Labeling and Education Act Requirements, published in August 1994, the FDA explains what each of these categories means. "Butter, margarine, oil, shortening" is defined as "All types of butter and margarine (regular, diet, liquid, and whipped); spreads; oils; and shortenings." *See* https://www.fda.gov/ICECI/Inspections/InspectionGuides/ucm114704.htm#ATTACHMENT_26 (last accessed January 10, 2019). For much of the class period, "Spray types" were defined as "Nonstick cooking sprays (e.g., Pam)." *Id.*

44.    In February 2018, the FDA updated its guidance. Instead of defining "Spray types" as "Nonstick cooking sprays (e.g., Pam)," "Spray types" are now defined as "All types of cooking sprays (e.g. cooking spray olive oil)." The FDA has also stated that the list of product examples for all categories was "not meant to be exhaustive." The FDA made another minor, inconsequential modification to the Serving Size Table in February 2018. Specifically, it moved the word "spreads" from the parenthetical list of examples of products falling into the "Butter, margarine, oil, and shortening" category, and changed that list to "[a]ll types of butter and margarine spreads (regular, diet, lite/light, liquid, and whipped); oils; and shortenings."

45.    But under both the new and old regulations, ICBINB Spray clearly fits under the "Butter, margarine, oil, and shortening" category for many reasons. First, as explained in Paragraphs 18-19, 23, 31, 55-56, it is marketed to consumers to use like butter, and thus, even if it is not technically a "spread" or "oil" the FDA has said that its list is "non-exhaustive". Second, as explained in paragraphs 74-80, its statement of identity renders it an oil or spread, and the regulations do not suggest that the FDA intended to exclude butter and margarine topping substitutes that happen to be dispensed via a spray bottle from this category.

46.    Moreover  for reasons set forth in paragraphs 50-54, the formulation of the ICBINB Spray prevents it from working as a cooking spray. Indeed, the new example --  cooking spray olive oil – is a cooking spray, because it is essentially 100% olive oil with a trace amount of propellant; unlike ICBINB Spray, it is not oil suspended in water. Finally, as discussed in paragraphs 48-56, it is "substitute" product and diet version for butter, margarine, and other ICBINB products.

47.    Under FDA regulations, the proper minimum serving size for butter, margarine, and their substitutes is one tablespoon, which is equivalent to 40 sprays. *See* 21 C.F.R. 101.12, Table 2. Because each tablespoon of ICBINB Spray contains approximately 32 calories and 3.2 grams of fat, a proper label would state that the product contains a 1160 calories and 124 grams of fat for the bottle as a whole, and 32 calories and 3.2 grams of fat per serving.[4]

**3.    Defendants Cannot Classify the Product as a Cooking Spray.**

48.    With respect to Defendants' attempt to classify ICBINB as a cooking spray and list the serving size as 1 Spray, this decision is not permitted by the FDA for several reasons. First, "cooking spray" is inconsistent with ICBINB Spray's "actual conditions of use," and is not the product's "major intended use." *See* 21 C.F.R. §101.9(b)(1), §101.12(a)(7). Consumers do not typically use ICBINB Spray to coat pans for cooking like they do with PAM, and even if they did, such usage is not the major use of the product.

49.    The major use of the ICBINB Spray is as topping and substitute for butter, margarine, and other ICBINB products, i.e., other toppings. Consistent with 21 C.F.R. 101.13(d),

---

[4] There are roughly 40 "sprays" of ICBINB per tablespoon (i.e., one tablespoon = 40 sprays).

the ICBINB Spray is a substitute for those things, because it may be used interchangeably with butter or other ICBINB products. First, it is like those products organoleptically, in that it smells and tastes like butter and butter substitutes. Second, it is physically like those things, in that it has the same ingredient list as other ICBINB products. Namely, both contain (in the following order), purified water, soybean oil, palm kernel oil, palm oil, salt, soy lecithin, natural flavors, vinegar, Vitamin A Palmitate, and beta-carotene. Third, ICBINB Spray, like butter and butter substitutes, must be refridgerated, unlike cooking sprays, and  the identical ingredients suggest the products have the same shelf life. The difference between ICBINB Spray and other butter substitutes is merely how the products are dispensed, but many products are sold in a variety of different containers to respond to consumer preference (e.g. mayonnaise and mustard are sold in jars and squeeze bottles). Notably, tubs and bars of other I Can't Believe It's Not Butter products all use a 1 tablespoon serving size.  Unilever also used to distribute a squeeze bottle version of I Can't Believe It's Not Butter, dispensing a liquid version of the product. The squeeze bottle version of I Can't Believe It's Not Butter looked nearly identical to the spray bottle version, except that it used a nipple dispenser instead of a pump spray dispenser.   Like other I Can't Believe It's Not Butter products, the squeeze bottle used a 1 tablespoon serving size with 60 calories and 7g of fat, not "0 calories" or "0g Trans Fat." The ICBINB squeeze bottle product was marketed as a topping.

50.    ICBINB Spray is not a cooking spray, or even a substitute for cooking sprays because that is not its major intended use, and because it is not like them. organoleptically, physically, or functionally. Because cooking sprays are essentially pure oils, "cooking sprays" heat to a temperature in the range of 375°-400° F, as required to saute food. In contrast, ICBINB Spray cannot rise above 212° F until the water in it has boiled away. While the water that comprises 60% of ICBINB Spray is present, it cannot provide a non-stick cooking surface, unlike a cooking spray. While the water in ICBINB Spray evaporates when exposed to high heat, that leaved approximately 0.08 grams of the .2 gram "spray" to act as a cooking surface. But because Pam and other nonstick sprays contain no water, the entire .25 gram of product expressed when spraying remains on the pan. This means that a cook must use almost three times as much ICBINB Spray by weight to obtain the same 0.25g of oil that would be dispensed in a single serving of cooking spray.

51.    ICBINB Spray also differs from "spray types" physically because they are under pressure due to their propellant, which is absent from IBCINB Spray.  The propellant and aerosol can format allow cooking sprays to be dispensed in a fine, wide ranging mist, allowing a consumer to coat a pan for cooking quickly and efficiently – in a second or two – and making it plausible that the recommended serving size can actually coat a pan. By way of contrast, ICBINB is dispensed via manual pump without the assistance of propellant, and thus, is not expelled as finely and with as much breadth. This makes it impossible for one pump to coat a pan, and extremely unlikely that even five pumps could coat a pan. As Defendants' own website makes clear, ten pumps is the recommended serving size to use the spray to coat a pan to prepare a two-egg omelette for one. See paragraph 56. Thus, not only does the fact that the product simply cannot work as a cooking spray mean that that cannot be its major intended use, but it also means that it is not a substitute product due to the fact that they are functionally different products.

52.    Consumers do indeed primarily use ICBINB Spray to top food, as they would butter or margarine or other ICBINB products.  They routinely apply it to foods complimented by butter like potatoes and oatmeal and use it - like butter - as a topping for vegetables and toast. And the product is thick, yellow, and vicous, like butter and margarines. To a lesser extent, consumers also use ICBINB spray - like butter - as a cooking ingredient (e.g. to toss vegetables in before sauteing). But that differs from using ICBINB as a cooking spray; as discussed in the prior paragraph, the slow and imprecise method by which the product dispenses from the pump makes it implausible to think that consumers would coat even a small, six inch skillet to cook eggs for one person with just one pump, or even five. And because ICBINB spray is used to impart the flavor of butter and because of the high water content, consumers use ICBINB in quantities similar to that of butter, far in excess of the 0.25 grams (i.e. 1 spray) listed on the nutritional panel.

53.    Moreover, ICBINB Spray's serving size cannot be (and is not) expressed in the same way as actual cooking sprays because it is a pump spray, not a pressurized spray like Pam that is dispensed by pressing down for a period of time. Because they are under pressure and dispensed without pumping, the FDA regulations explain that "spray type" oils are to be expressed as a serving size "0.25 g [or] ***About [[___]] seconds spray***." 21 CFR 101.12 Table 2 (emphasis

added), not a number of "pumps." Notably, ICBINB's spray mechanism is removable. Consumers can bypass the spray mechanism to pour ICBINB spray on food as a topping. The spray mechanism for Pam cannot be removed. Thus, physically and functionally, it is not the same product.

54.    Moreover, organoleptically, it is nothing like cooking spray, which contains aerosol propellants but not water. Cooking spray thus does not taste or feel buttery because, unlike butter (and margarine), cooking spray is not an emulsion of fat and water, and is not intended to impart flavor on a food. Companies that market cooking spray typically emphasize characteristics like the product's ability to prevent food from sticking to pans or make clean up easier. Defendants have never touted such characteristics of ICBINB Spray as they are not true of the product, nor do Defendants intend for consumers to rely on such claims. On the other hand, Defendants have consistently advertised the product as being a butter substitute and imparting butter flavor, because Defendants intend for consumers to use it on food in the same way they use butter. Finally, the different composition in ingredients also means that while cooking spray is shelf-stable, Defendants recommend that the ICBINB Spray be kept refrigerated, and even sell it in the refrigerated section of stores, next to butter and butter substitutes.

55.    In fact, the ICBINB website shows that even Defendants recognize that the major intended use for ICBINB Spray is to top food, not cook with it. On the main page for the ICBINB Spray product, Defendants have placed the following:

1
2
3
4
5
6
7
8
9
10
11
12
13
14



*See* https://www.icantbelieveitsnotbutter.com/products/original-butter-spray/ (last accessed January 8, 2019).

56.    The ICBINB website acknowledges that the ICBINB Spray is not an appropriate choice for nonstick coating. On January 8, 2019, Defendants had included twelve recipes on the ICBINB website that utilize ICBINB Spray. Nine of those recipes use ICBINB Spray as a topping, several of which instruct the consumer to use a "nonstick cooking spray" (like Pam) to provide a nonstick coating for baking. Those recipes do ***not*** direct the consumer to use ICBINB Spray for those purposes, because ICBINB Spray is not a cooking spray like Pam, and is not suited for those purposes. While three recipes do recommend coating a pan with ICBINB Spray before cooking, ***all of them recommend a number of sprays that exceed Defendants' own recommended 1-spray serving size for use as a cooking spray***, no doubt because they know that one spray will not deliver enough oil and fat to function as a cooking spray. For example, a recipe for a single serving of an omelet calls for 10 sprays, and a berry dessert calls for 5 sprays. And a recipe for sauteed shrimp that serves four recommends that people "[s]pray generously [sic] large nonstick skillet with I

Can't Believe It's Not Butter! Spray Original."

**4.     Defendants Are Not Insulated By Their Use Of A "Secondary" Usage Of A 5-Spray "Topping" Serving Size.**

57.     Defendants' decision to list a secondary serving size of 5 Sprays for most of the class period as a "topping" does not excuse them from their violation of the FDA regulations.

58.     The FDA requires that where a product is promoted for a use that differs from the reference category chosen, and standard usage "differs in quantity by twofold or greater from the use upon which the reference amount in § 101.12(b) was based," the manufacturer must provide a second column of nutrition information "based on the amount customarily consumed in the promoted use, *in addition to the nutrition information per serving derived from the reference amount in 101.12(b)*…." 21 C.F.R. § 101.9(b)(11) (emphasis added).  Because Defendants have not provided information for a serving size of one tablespoon as required by section 101.12(b) as explained *supra,* their inclusion of the "secondary" information of a serving size of five sprays is not exculpatory.  Further, Defendants did not even choose the five spray serving because it was the amount customarily consumed, but instead because it was the largest number of sprays they could select to keep the number of calories and fat below 5 and 0.5 grams, respectively, so that they could then "round down" to zero.

59.     21 C.F.R. § 101.9(b)(11) notes the requirement to provide a secondary serving size column does not apply to "nondiscrete bulk products that are used primarily as ingredients (e.g., flour, sweeteners, shortenings, oils), or traditionally used for multipurposes (e.g., eggs, butter, margarine), and multipurpose baking mixes…."  This exemption does not help Defendants because at best it would relieve them of the obligation to provide the *secondary* serving size based on customary usage, but not the obligation to provide the *primary* serving size information as required by section 101.12(b), which they did not do for the reasons stated above.

60.     While Defendants may maintain that 40 sprays is an unreasonably and/or implausibly large serving size, Defendants decision to list nutritional information for one spray, or even five sprays, is still problematic and unlawful for at least two reasons.

61.     First, if Defendants felt that the ICBINB Spray did not appropriately fit in any of the

categories in the Serving Size Table, Defendants are still not permitted to choose whatever serving size they wish. Instead, the correct choice of action would have been for Defendants to have filed a petition to request a new serving size be created. Defendants not only did not do so, but it is unlikely such a petition be granted. Such a petition requires data that demonstrates that the new subcategory would be consumed in amounts different enough from the reference amounts for other products in the category, as required by 21 C.F.R. § 101.12(f) (13). Defendants do not have any such data. But Defendants know that the FDA permits food marketers to round down to zero when a product contains less than 5 calories or a half gram of fat, and five sprays of ICNINB Spray contain 4 calories and 0.4 grams of fat, which is below that threshhold. 21 C.F.R. §§ 101.60(b)(1)(i), 101.62(b)(1)(i).  Defendants selected their serving size based not on reasonable evidence of consumer usage, but because it is the largest possible serving size that Defendants could hold out as having no fat or calories. This would not support an amended serving size under FDA regulations.

62.    Second, the FDA requires food manufacturers to list certain material facts on the packaging for their products. Under 21 C.F.R. § 2.1(a), food labels are deemed misleading if the labels fail to reveal facts that are either (1) "material in light of other representations made or suggested"; or (2) "material with respect to consequences which may result from use of the [labeled food] under ….conditions of use as are customary or usual." Here, even if Defendants could assert that the product is correctly classified as a cooking spray, Defendants were still required to disclose more information about the presence of fat and calories in the product, due to the customary or usual conditions under which the product is used (and Defendants' recommend it to be used) and the fact that Defendants know the fat and calorie content is material to consumers, as they have decided to place that information on the front of the packaging.

63.    As  a topping and butter substitute, consumers use significantly more than "five sprays", so customary consumption is never 0-fat or 0-calories. Defendants know that consumers customarily use more than 5 sprays per serving when using it as a topping.  In fact, they encourage it.  For example, in Defendants' recipe for summertime grilled vegetables directs the consumer to use *thirty* sprays for a recipe that serves four people—or 8.5 sprays per serving a serving size that

is **35% *larger*** than claimed on the package, and which would provide 7 calories and 1 gram of fat:[5]

**Ingredients**

3 lbs. your favorite vegetables (such as red onions, zucchini, asparagus, and/or bell peppers), sliced or cut into chunks
30 sprays I Can't Believe It's Not Butter!® Spray Original

**Directions**

1. Alternately thread vegetables on skewers*. Grill or broil vegetables until tender. Arrange vegetables on serving platter. Spray with I Can't Believe It's Not Butter!® Spray Original.

The same is true for Defendants' recipe for savory balsamic asparagus.[6]

64.    Defendants also are aware that it is common for consumers to open the spray top of the bottle and simply pour the ingredients onto items such as baked potatoes, popcorn, vegetables, and other items, because consumers have been misled into believing that the product is entirely fat-free and calorie-free.

**5.    Defendants' Scheme Thwarts the Purpose of the FDA Regulations.**

65.    As the FDA has explained, "the agency is proposing these standard serving sizes to assure that nutrition labels on similar types of foods are consistent, so that consumers will be able to easily and readily make comparisons of nutrient content among products. In addition, FDA expects that standard serving sizes will eliminate some of the problems that occur when manufacturers manipulate serving sizes to make a product appear, for example, lower in calories . . . than it would if a more objective serving size were used."   55 F.R. 29517 (July 19, 1990). *See also* 56 F.R. 60394, 60397 (Nov. 27, 1991) ("The agency believes that by grouping foods that have similar dietary usage into one category, a reasonable and appropriate serving size for all food within a category can be established . . . a consistent serving size for similar products enables consumers to compare the nutritional value of foods that are used interchangeably in the diet.").

66.    In March of 2004, the FDA issued a guidance letter to the food industry that indicated the FDA was concerned about the use of improper serving sizes. The letter stated:

Dear Food Manufacturer:

As you are aware, the Food and Drug Administration (FDA) is

---

[5] *See* http://www.icantbelieveitsnotbutter.com/recipes/detail/31944/1/summertime-grilled-vegetables (last accessed August 17, 2018).

[6] *See* http://www.icantbelieveitsnotbutter.com/recipes/detail/33249/1/savory-balsamic-asparagus (last accessed August 17, 2018).

involved in an initiative to give consumers helpful information that will enable them to make more informed choices about their diets and lifestyle in an effort to reduce the incidence of overweight and obesity in the United States. A key component in providing nutrient information to consumers is the "Nutrition Facts" panel on food packages. In order for this nutrition information to be useful to consumers, it must be accurate and based on a meaningful amount of food. After the Nutrition Labeling and Education Act was enacted, thereby mandating nutrition labeling, FDA promulgated regulations that specify how serving size must be derived from an appropriate reference amount for the food commodity in question. . . . Therefore, we are taking this opportunity to remind the food industry about the rules for determining an appropriate serving size. Manufacturers must use the information provided in Title 21 of the Code of Federal Regulations (CFR) sections 101.9(b) and 101.12 to determine a specific serving size for their products. . . .

FDA encourages the food industry to review their nutrition information and assure that the serving size declared is appropriate for the commodity in question. FDA also encourages manufacturers to refer to our guidance documents at www.cfsan.fda.gov for additional information on serving sizes.[7]

67.    Defendants have known that ICBINB Spray was mislabeled and that it confused consumers for years. Defendants were sued in 2013 for falsely advertising the fat and calorie content of ICBINB Spray, a case that is still pending. *See Pardini, et. al v. Unilever United States, Inc.* Case No. 13-cv-1675 (N.D.Cal.). As the plaintiffs in that case noted, the Internet is replete with complaints echoing those of the named Plaintiffs here. For example, a contributor to the website "sparkpeople.com" writes:

I agree that most nutritional info can be misleading, but the butter spray takes the cake! Based on their logic, Doritos could advertise their chips as being 0 cal and 0 fat if they dropped the serving size down to half a chip. They should not legally be allowed to advertise a product with such a small serving size. Not to mention it's next to impossible to measure. Nor is it a valid form of measurement. A more realistic approach would be to base the nutrition info on a tsp. of spray.[8]

---

[7]    Letter to Food Manufacturers about Accurate Serving Size Declaration on Food Products, March 12, 2004, available at: https://web.archive.org/web/20140208203103/http://www.fda.gov:80/AboutFDA/CentersOffices/OfficeofFoods/CFSAN/CFSANFOIAElectronicReadingRoom/ucm329756.htm (last accessed September 17, 2018).

[8]    (*See* Toozluv, Comment to I *Can't Believe It's Not Butter Spray Full of Fat!*, SparkPeople (July 8, 2013), http://www.sparkpeople.com/myspark/messageboard.asp?imboard=1&imparent=31440612.)

68.    As one consumer commented, "[t]his issue makes me furious – so often products that are full of fat, and even trans fats, designate completely ridiculous serving sizes, then 'round' the fat down to zero. Often, they won't even have on the label anywhere what the actual fat content is. So people think there's no fat when there's a ton."[9] Another contributor, commenting on spray buttery toppings generally, stated: "Well that's just stupid… [I've] never used ONE spray."[10] Some consumers use so much of the product at a time that they bypass the spray mechanism altogether and pour the product. For instance, one consumer commented: "A while back, I thought I had discovered a gold mine! I can't believe it's not butter spray! For a butter substitute! 0 calories, yada, yada. But after a bit, I began unscrewing the cap and pouring it on my potato, my oatmeal, etc. Just now, I googled it to see if it's bad for me (I was so sure it wasn't, ha) and dang it, it is."[11]

69.    Defendants ignored these consumer complaints and the FDA's guidance and continued to use their deceptive and misleading product labels.

70.    Defendants continue to market the ICBINB Spray using baseless serving sizes because they profit enormously from it. In particular, the ICBINB Spray costs more than similar products without misleading advertisements and misrepresentations, and—as can be demonstrated using econometric or statistical techniques such as hedonic regression or conjoint analysis—would have cost less absent the false and misleading statements.

---

[9] Crabby McSlacker, Comment to *I Can't Believe It's Not Butter Spray Is Full of Fat – Buyer Beware*, That's Fit (June 1, 2007), https://web.archive.org/web/20130730181438/http://www.thatsfit.com:80/2007/06/01/i-cant-believe-its-not-butter-spray-is-full-of-fat-buyer-be (last visited September 17, 2018.

[10] Elizabethberg, Comment to *The Truth About "0" Calorie Parkay Butter Spray*, Calorie Count (April 10, 2008), https://web.archive.org/web/20130514064306/http://caloriecount.about.com/forums/foods/truth-calorie-parkay-butter-spray (visited September 17, 2018).

[11]    MaryBBrown, Comment to *I Can't Believe It's Not Butter-Spray*, MyFitnessPal (April 14, 2011), http://www.myfitnesspal.com/topics/show/217304-i-can-t-believe-it-s-not-butter-spray-i-think-it-s-bad-fo (last accessed September 17, 2018).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**C.    Defendants include fat and calorie content claims on the front label of ICBINBN Spray in violation of federal regulations.**

71.    To perpetuate the belief among consumers that ICBINB Spray is actually free of fat and calories and to otherwise obscure its true nutritional profile, Defendants also failed to disclosed that ICBINB Spray is actually "40% vegetable oil," as required by law.

**1.    Overview of the Food and Drug Administration's Nutrient Content Claim Regulations.**

72.    In addition to regulations that require a manufacturer to disclose the total number of calories and fat per serving in the nutritional label (see paragraphs ¶¶ 37-40), the FDA has promulgated regulations governing the product's identity and related nutrient content claims. *See* 21 C.F.R. §101.13, "Nutrient content claims –general principles."

73.    These regulations impose requirements on manufacturers that wish to make claims about the nutrient contents, including fat and calorie content, on the packaging, outside of the nutritional facts panel. 21 C.F.R. §§101.13(b); 101.9(c)(1-2); 101.13(c).

74.    In particular, the regulations prohibit manufacturers from including a nutrient content claim about fat or calories unless they also include a statement of identity on the front label. 21 C.F.R. §101.13(f). The statement of identity is the common or usual name of the food or in the absence thereof an appropriately descriptive term. 21 C.F.R. §101.3(b). It tells the consumer – in as simple and direct terms as possible – the basic nature of the food or its characterizing properties or ingredients. 21 C.F.R. §102.5(a).

75.    Furthermore, when the presence of an ingredient is material to the consumer, manufacturers are required to include the percentage of that material ingredient in easily legible boldface print or type, in distinct contrast to other printed or graphic material and in a height not less than one-eighth inch. 21 C.F.R. §102.5(b). And when consumers may otherwise be misled about the presence or absence of an ingredient or component, the statement of identity must include a statement denoting the presence or absence of that ingredient or component, e.g., "containing (or contains) _____". 21 C.F.R. §102.5(c).

76.    Finally, in addition to being required to print a statement of identity on the front of the label, the nutrient content claims cannot be more than twice the size of the statement of identity and cannot be in an unusual type style relative to the statement of identity. 21 C.F.R. §§101.13(f); 101.3(d).

### 2. Defendants Failed to Inform Consumers That ICBINB Spray Contains 40% Vegetable Oil as Required.

77.    Defendants ignored the nutrient content regulations and made express claims regarding the calorie and transfat content of ICBINB Spray on its front label without providing a statement of identity or the material ingredient on the label.

78.    Even though Defendants represented that ICBINB Spray was "0 g trans fat per serving" "0 calories per serving" "0 calories per 1 spray," throughout the class period and until approximately mid-2018, ICBINB Spray did not include a statement of identity telling consumers that ICBINB Spray is actually 40% vegetable oil.

79.    Defendants' statement that the product is a "buttery spray" does not satisfy the regulations because it does not accurately describe the basic nature of the food or the characterizing properties or ingredients, as required by 21 C.F.R. 102.5(a). Moreover, it does not actually contain any information about the presence of any characterizing ingredient, which is required when consumers might be mislead about the presence or absence of ingredients or components. *Id*. Butter is not an ingredient in the product, and consumers are likely to be misled as to the presense of oil in a product that supposedly has no calories.

80.    "Buttery spray" is also a problematic statement of identity because it differs from how similar products are advertised, and the regulations require that it be "uniform among all identical or similar products." 21 C.F.R. 102.5(a). Defendants' competitors all disclose on the front of the package the percentage of vegetable oil contained in the product. For example, Parkay Spray advertises itself as a butter-flavored, zero calorie spray, discloses on the front label that the product is "44% vegetable oil spread." Similarly, other butter substitute companies routinely print on the front of the packages a statement about the oil content of the product. For example, on packages of

Bummel & Brown, a butter substitute made from yogurt, the company prints "35% vegetable oil spread, 10% nonfat yogurt." And while Defendant has characterized this product as a "spray" akin to cooking sprays, even those sprays disclose their oil content on the front. For example, on the front of PAM canisters, it states "100% Canola Oil."

81.    Defendants' failure to inform consumers that ICBINB Spray is actually 40% vegetable oil perpetuated the belief among consumers that ICBINB Spray contained a negligible amount of fat and calories on a percentage basis.

82.    This failure also rendered the "0 transfat" and "0 calories" claims on ICBINB's front label unlawful and in violation of FDA regulations.

**D.    Defendants' Intend to Continue to Market Products as Having Zero Calories and Fat.**

83.    Because Defendants know consumers rely on representations about the fat and calorie contents in grocery store items, Defendants have an incentive to continue to make false representations.

84.    In the summer of 2018, Defendants rolled out new packaging for the ICBINB Spray. The packaging still represents on the front of the label that the product contains zero calories and no trans fat. But on the back, Defendants have omitted the second made-up five spray "topping" category from nutritional information, noting only that the product contains no fat and calories per one spray. Thus, despite being sued in 2013 and fighting the lawsuit for over five years, Defendants have chosen to modify their packaging to provide even less information for those consumers who wish to read the entire label.

85.    To capitalize on the market for low fat, low calorie foods, Defendants may not only continue to misleadingly advertise their ICBINB Spray, but they could seek to replicate the misrepresentation in other ways. For example, Defendants own other brands of margarine and low fat butter-like spreads, such as Country Crock, Bummel & Brown, and Promise.  While Defendants do not currently advertise these brands as having any calorie and fat free options, Defendants have an incentive to replicate the successful misrepresentation on those products.

86.    Defendants have also begun working with the Upfield Defendants, consumer

packaged goods companies, which has purchased the ICBINB brand and has licensed the product line back to Defendants to manufacture and sell. To ensure they can keep profiting from their false advertising, Defendants may work with Upfield Defendants to sell the same product formulation under a different brand. In fact, last year, Defendants changed the name of "I Can't Believe It's Not Butter" to "I Can't Believe Its So Good" in various European countries and began utilizing different packaging there. Thus, consumers may be tricked into purchasing the product here.

87.    As consumers are not food scientists, and cannot test products to determine their calorie count or fat products, consumers cannot possibly determine if the product they are purchasing is actually zero fat and zero calories.

**E.    Plaintiffs' Experiences**

88.    Plaintiffs are reasonably diligent consumers, and when they purchased ICBINB Spray, they were looking for calorie-free and fat-free alternatives to butter.

**1.    Jennifer Zizumbo**

89.    While shopping in grocery stores in and around her home in San Diego, California, Plaintiff Zizumbo encountered ICBINB Spray in the refrigerated section of grocery stores. She noted that the product appeared next to butter and margarine—products for which ICBINB Spray was promoted as a calorie-free and fat-free alternative.

90.    Ms. Zizumbo first purchased the ICBINB Spray approximately ten years ago. She recalls reading the representation on the front label that ICBINB Spray is "0 calories," each time she purchased it. She also recalls seeing that the ICBINB Spray is "great for topping & cooking." She began regularly buying the product, typically purchasing it approximately every other month, until approximately the summer of 2018. Ms. Zizumbo always purchased the original flavor, except for one occasion when she purchased the olive oil flavor. She usually bought the product at Von's, but occasionally bought it at Stater Brothers. She usually paid a couple dollars a bottle.

91.    Before deciding to purchase ICBINB Spray for the first time, Ms. Zizumbo inspected the nutritional panel and back label generally. Specifically, she saw and read representations that ICBINB Spray contains "Calories 0," and "Total Fat 0g." She noted that these

statements were consistent with Defendants' claims on the front label. Notably, she did not see any disclosure or other indication on the nutritional panel that ICBINB Spray actually contains fats and calories, or that it was 40% vegetable oil.

92.    Over the years, Zizumbo regularly reviewed the fat and calorie information on the package when purchasing the product to confirm that it still had zero fat and zero calories. Ms. Zizumbo relied on Defendants' representations that the ICBINB Spray was fat and calorie free in deciding to purchase ICBINB Spray each time she purchased the product. She used the ICBINB Spray as a topping, and not as a cooking spray, and thus, used many more than one spray per serving, and often more than five sprays per serving.

93.    Ms. Zizumbo was unaware that ICBINB Spray contains approximately 32 calories and 3.2 grams of fat, per tablespoon. Ms. Zizumbo was also unaware that a single 12-ounce bottle of ICBINB Spray contains 1,160 calories and 124 grams of fat.

94.    Had Mrs. Zizumbo known that ICBINB Spray contains calories, she would not have purchased the product, or would have paid less for it.

95.    Had Mrs. Zizumbo known that ICBINB Spray contains fat, she would not have purchased the product, or would have paid less for it.

96.    Had Mrs. Zizumbo known that ICBINB Spray was 40% vegetable oil, she would not have purchased the product, or would have paid less for it.

97.    Mrs. Zizumbo has never used ICBINB Spray as a cooking spray, nor has she ever believed that ICBINB Spray is intended to be used as a cooking spray.

98.    Mrs. Zizumbo routinely used more than five sprays when using ICBINB Spray on her food.

**2.    Chandra Zundel**

99.    While shopping in grocery stores in and around her home in San Diego County, California and prior to that, in Florida, Plaintiff Zundel encountered ICBINB Spray in the refrigerated section of grocery stores. She noted that the product appeared next to butter and margarine—products for which ICBINB Spray was promoted as a calorie-free and fat-free alternative.

1    100.    Ms. Zundel has been purchasing the ICBINB Spray since approximately 2004 or

2    2005. While there may have been minor label variations over the years, she recalls reading the

3    representation on the front label that ICBINB Spray is "0 calories," each time she purchased it. She

4    also recalls seeing that the ICBINB Spray is "great for topping & cooking." Since approximately

5    2010, she typically purchased the product at the military base commissary where she resided,

6    including at the Miramar Maine Corps Air Station in San Diego County, California, and Marine

7    Corps Base Camp Pendleton in San Diego County, California.

8    101.    Before deciding to purchase ICBINB Spray for the first time and at various other

9    times, Ms. Zundel inspected the nutritional panel and back label generally. Specifically, she saw

10    and read representations that ICBINB Spray contains "Calories 0," and "Total Fat 0g." She noted

11    that these statements were consistent with Defendants' claims on the front label. Notably, she did

12    not see any disclosure or other indication on the nutritional panel that ICBINB Spray actually

13    contains fat and calories, or that it was 40% vegetable oil.

14    102.    Ms. Zundel relied on Defendants' representations that the ICBINB Spray was fat

15    and calorie free in deciding to purchase ICBINB Spray each time she purchased the product. She

16    used the ICBINB Spray as a topping, and not as a cooking spray, and thus, used many more than

17    one spray per serving, and often more than five sprays.

18    103.    Ms. Zundel was unaware that ICBINB Spray contains approximately 32 calories

19    and 3.2 grams of fat, per tablespoon. Ms. Zundel was also unaware that a single 12-ounce bottle of

20    ICBINB Spray contains 1160 calories and 124 grams of fat.

21    104.    Had Ms. Zundel known that ICBINB Spray contains calories, she would not have

22    purchased the product, or would have paid less for it.

23    105.    Had Ms. Zundel known that ICBINB Spray contains fat, she would not have

24    purchased the product, or would have paid less for it.

25    106.    Had Ms. Zundel known that ICBINB Spray was 40% vegetable oil, she would not

26    have purchased the product, or would have paid less for it.

27    107.    Ms. Zundel has never used ICBINB Spray as a cooking spray, nor has she ever

28    believed that ICBINB Spray is intended to be used as a cooking spray.

108.    Ms. Zundel has almost never used ICBINB Spray in any application for fewer than ten sprays.

**3.    Adrianne Ordaz**

109.    While shopping in grocery stores in and around her home in Altadena, California, Plaintiff Ordaz encountered ICBINB Spray in the refrigerated section of grocery stores. She noted that the product appeared next to butter and margarine—products for which ICBINB Spray was promoted as a fat-free and calorie-free alternative.

110.    Ms. Ordaz has been purchasing the ICBINB Spray since for almost ten years. While there may have been minor label variations over the years, she recalls reading the representation on the front label that ICBINB Spray is "0 calories," regularly over the ten years she purchased it. She bought the product a couple times a year, typically at Von's supermarket, but occasionaly at Ralph's and other grocery stores in her area.

111.    Before deciding to purchase ICBINB Spray, Ms. Ordaz inspected the nutritional panel and back label generally. Specifically, she saw and read representations that ICBINB Spray contains "Calories 0," and "Total Fat 0g." Notably, she did not see any disclosure or other indication on the nutritional panel that ICBINB Spray actually contains fats and calories, or that it was 40% vegetable oil.

112.    Ms. Ordaz relied on Defendants' representations that the ICBINB Spray was fat and calorie free in deciding to purchase ICBINB Spray each time she purchased the product. She used the ICBINB Spray as a topping, and not as a cooking spray, and thus, used many more than one spray per serving, and often more than five sprays.

113.    Ms. Ordaz was unaware that ICBINB Spray contains approximately 32 calories and 3.2 grams of fat, per tablespoon. Ms. Ordaz was also unaware that a single 12-ounce bottle of ICBINB Spray contains 124 grams of fat and 1160 calories.

114.    Had Ms. Ordaz known that ICBINB Spray contains calories, she would not have purchased the product, or would have paid less for it.

115.    Had Ms. Ordaz known that ICBINB Spray contains fat, she would not have purchased the product, or would have paid less for it.

116.    Had Ms. Ordaz known that ICBINB Spray was 40% vegetable oil, she would not have purchased the product, or would have paid less for it.

117.    Ms. Ordaz has never used ICBINB Spray as a cooking spray, nor has she ever believed that ICBINB Spray is intended to be used as a cooking spray.

118.    When using ICBINB Spray, Ms. Ordaz typically uses many sprays – far more than five per serving.

119.    Plaintiffs are not nutritionists, food experts, or food scientists; Plaintiffs are lay consumers who did not possess Defendant's specialized knowledge or food testing capabilities which would have otherwise enabled them to see through Defendant's deceptive marketing and advertising.

120.    All Plaintiffs continue to desire to purchase fat free, calorie free butter substitutes from Defendants. they regularly visits stores where Defendants' ICBINB Spray, as well as other butter substitutes, such as Country Crock and Bummel & Brown, are sold. Without purchasing and having the products professionally tested, Plaintiffs will be unable to determine if the ICBINB Spray truly is fat and calorie free.  Plaintiffs understand that the formulation of the ICBINB Spray may change over time or Defendants may respond to pressure from government agencies or litigation.  But as long as Defendants may use inaccurate serving sizes to describe products as zero calories and zero fat, then when presented with Defendants' packaging, Plaintiffs continue to have no way of determining whether the representations regarding the fat and calorie content is in fact true. Thus, Plaintiffs are likely to be repeatedly presented with false or misleading information when shopping and unable to make informed decisions about whether to purchase the ICBINB Spray. Moreover, because Defendants now work with third parties, such as Upfield, and have begun rebranding their ICBINB line in other countries, Defendants may try to introduce new products or major branding changes here in the United States, which may cause further confusion and uncertainty at the grocery store.  Thus, Plaintiffs are likely to further be repeatedly misled by Defendants' conduct, unless and until Defendants are compelled to utilize accurate serving sizes and present accurate nutritional information on their packaging.

## V.     CLASS ALLEGATIONS

121.     In addition to their individual claims, Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following groups of similarly situated persons, defined as follows:

> All persons who, between October 15, 2014 and the present, purchased, in the United States, any size bottle ICBINB Spray (the "Class");
>
> All members of the Class who made a ICBINB Spray purchase in California (the "California Subclass").

122.     Excluded from the Class are Defendants, their affiliates, successors and assigns, officers and directors, and members of their immediate families.

123.     The proposed Class is so numerous that joinder of all members is impracticable. The precise number of members in the Class is not yet known to Plaintiffs, but they estimate that it is well in excess of 1,000 people.

124.     There are questions of law and fact that are common to the Class, including, but not limited to, the following:

- whether Defendants misrepresented or omitted material facts in connection with the promotion, marketing, advertising, packaging, labeling and sale of ICBINB Spray;

- whether Defendants represented that ICBINB Spray has characteristics, benefits, uses or qualities that it does not have;

- whether Defendants misled class members by representing that ICBINB Spray has no fat;

- whether Defendants misled class members by representing that ICBINB Spray has no calories;

- whether Defendants were required to use a serving size of one tablespoon for ICBINB Spray;

- whether Defendants were required to include a statement of identity on the front label of ICBINB Spray;

- whether Defendants were allowed to make claims about the fat and calorie content of ICBINB Spray on the front label without also declaring on the front label that ICBINB

Spray is, by nature, 40% vegetable oil;

- whether Defendants were allowed to make claims about the fat and calorie content of ICBINB Spray on the front label without also declaring on the front label that ICBINB Spray contains vegetable oil;

- whether Defendants' nondisclosures and misrepresentations would be material to a reasonable consumer;

- whether the nondisclosures and misrepresentations were likely to deceive a reasonable consumer in violation of the consumer protection statutes of California;

- whether the nondisclosures and misrepresentations are unlawful and violate California's Sherman Food, Drug, and Cosmetic Act;

- whether Defendants breached an express warranty made to Plaintiffs and the Class;

- whether Defendants were unjustly enriched;

- whether Defendants intentionally misrepresented that ICBINB Spray is "0g fat" and "0 calories";

- whether Defendants' unlawful, unfair and/or deceptive practices harmed Plaintiffs and the members of the Class;

- whether Plaintiffs and the members of the Class are entitled to damages, restitution, and/or equitable or injunctive relief;

- whether Defendants breached their obligations to the Class;

- whether Defendants engaged in the alleged conduct knowingly, recklessly, or negligently;

- the amount of revenues and profits Defendants received and/or the amount of monies or other obligations lost by class members as a result of such wrongdoing;

- whether class members are entitled to injunctive relief and other equitable relief and, if so, what is the nature of such relief; and

- whether class members are entitled to payment of actual, incidental, consequential, exemplary, and/or statutory damages plus interest, and if so, what is the nature of such relief.

125.    Plaintiffs' claims against Defendants are typical of the claims of the Class because

Plaintiffs and all other members of the class purchased ICBINB Spray with the same attendant advertising, warranties, and representations. With respect to the class allegations, Plaintiffs were subject to the exact same business practices and representations.

126.    Plaintiffs will fairly and adequately protect the interests of the Class.

127.    Plaintiffs have demonstrated their commitment to the case, has diligently educated themselves as to the issues involved, and to the best of their knowledge does not have any interests adverse to the proposed class.

128.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

129.    A class action is superior to other available methods for a fair and efficient adjudication of this controversy as many members of the proposed Class have damages arising from Defendants' wrongful course of conduct which would not be susceptible to individualized litigation of this kind, including, but not limited to, the costs of experts and resources that may be required to examine the business practices in question.

130.    Given the relative size of damages sustained by the individual members of the Class, the diffuse impact of the damages, and homogeneity of the issues, the interests of members of the Class individually controlling the prosecution of separate actions is minimal.

131.    There is no litigation already commenced for these class representatives, nor is there anticipated to be subsequent litigation commenced by other members of the Class concerning Defendants' alleged conduct. A different set of class representative filed a similar action in the N.D. California. See *Kym Pardini and Carrie Wood v. Unilever United States*, 4:13-cv-01675-JSW (N.D. Cal. 2013). Consequently, concerns with respect to the maintenance of a class action regarding the extent and nature of any litigation already commenced by members of the Class are non-existent.

132.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this Class Action Complaint that would preclude its maintenance as a class action.

## VI.     CAUSES OF ACTION

133.     Plaintiffs do not plead, and hereby disclaim, causes of action under the Food Drug and Cosmetic Act ("FDCA") and regulations promulgated thereunder by the FDA.   Plaintiffs rely on these regulations only to the extent such laws and regulations have been separately enacted as state law or regulations or provide a predicate basis of liability under the state and common laws cited in the following causes of action.

**Plaintiffs' First Cause of Action**
**(Fraud, Deceit, and/or Misrepresentation)**
**On Behalf of Themselves and the California Subclass**

134.     Plaintiffs reallege and incorporate by reference all preceding paragraphs of this complaint as if fully set forth herein.

135.     As set forth above (inter alia, see supra, ¶¶ 34-64), Defendants chose to use the incorrect serving sizes of one spray and five sprays to calculate the amount of calories and fat to use on the ICBINB Spray label. Instead of using the one-tablespoon serving size required by FDA regulations, Defendants chose to use serving sizes of one spray and five sprays for the ICBINB Spray label. Defendants failed to use the proper FDA subcategory for ICBINB Spray—"Butter, margarine, oil and shortening." In doing so, Defendants not only violated FDA regulations, but also ignored the fact that when consumers use ICBINB Spray, they use many sprays (typically, 10-40 sprays). As made possible by their decision to use the incorrect serving size, Defendants falsely represented to Plaintiffs and those similarly situated that ICBINB Spray contains no fat and no calories.

136.     As set forth above (inter alia, see supra, ¶¶ 74-80), Defendants made "0 calories" and "0 transfat" representations on the front label of ICIBNB Spray without disclosing that ICBINB Spray is actually 40% vegetable oil.  In doing so, Defendants not only violated FDA regulations, but also created the firm impression that ICBINB Spray is a fat and calorie free alternative to butter that contains an insignificant amount of fat on a percentage basis.  As made possible by their decision to include unauthorized fat and calorie content claims on the front label of ICBINB Spray, Defendants falsely represented to Plaintiffs and those similarly situated that

ICBINB Spray has no fat and no calories.

137.    Defendants further concealed, suppressed, and omitted material facts that would have revealed that ICBINB Spray contains significant amounts of calories and fat.

138.    In addition, Defendants represented to all retailers of ICBINB Spray, including online retailers and brick-and-mortar retailers, that ICBINB Spray contains no calories and no fat. Defendants made these representations by providing to such retailers labels, packaging, and nutrition information pertaining to ICBINB Spray, stating that the product does not have calories or fat.

139.    Defendants made these representations to retailers with the knowledge and intent that the retailers would represent to Plaintiffs, and others similarly situated, that ICBINB Spray has no calories and no fat.

140.    Defendants' representations—both those made directly to consumers on Defendants' website and on the product, and those made indirectly to consumers through retailers and on the product labels—were false, and Defendants knew that the representations were false when they made them. In particular, as described above (supra, ¶¶ 48-64), Defendants knew (i) that consumers use ICBINB Spray as a topping; (ii) consumers habitually use between 10-40 sprays when topping food, not 5; (iii) that consumers do not use ICBINB Spray as a cooking spray; (iv) that ICBINB Spray is ill-suited for use as a cooking spray; and (v) that the FDA regulations pertaining to cooking sprays were referring to non-stick cooking sprays like Pam, which are fundamentally different from ICBINB Spray because they are not water-based sprays. Accordingly, Defendants knew that the proper FDA category for ICBINB Spray was the default subcategory, "Butter, margarine, oil and shortening."

141.    Defendants' misrepresentations and omissions were material at the time they were made. They concerned material facts that were essential to the analysis undertaken by Plaintiffs and those similarly situated as to whether to purchase ICBINB Spray.

142.    Plaintiffs and those similarly situated reasonably relied to their detriment on Defendants' representations—both those that Defendants made directly to them, and those that Defendants made indirectly to them through retailers. Specifically, Plaintiffs and those similarly

situated purchased ICBINB Spray because they believed that it had no fat and no calories. This reliance was reasonable because Plaintiffs reasonably expected that Defendants would have complied with FDA labeling regulations. Plaintiffs had no reason to doubt that established food manufacturers and distributors such as Defendants would comply with basic FDA regulations regarding serving sizes and claims regarding transfat and calorie content on the front label.

143.    Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation, not purchasing (or paying less for) ICBINB Spray.

144.    Defendants had a duty to inform members of the California Subclass at the time of their purchase that ICBINB Spray contains calories and fat. In making their representations and omissions, Defendants breached their duty to subclass members. Defendants also gained financially from, and as a result of, their breach.

145.    By and through such fraud, deceit, misrepresentations and/or omissions, Defendants intended to induce Plaintiffs and those similarly situated to alter their position to their detriment. Specifically, Defendants fraudulently and deceptively induced Plaintiffs and those similarly situated to, without limitation, to purchase ICBINB Spray.

146.    As a direct and proximate result of Defendants' misrepresentations and omissions, Plaintiffs and those similarly situated have suffered damages. In particular, Plaintiffs seek to recover on behalf of themselves and those similarly situated the amount of the price premium they paid (i.e., the difference between the price consumers paid for ICBINB Spray and the price they would have paid but for Defendants' misrepresentations), in an amount to be proven at trial using econometric or statistical techniques such as hedonic regression or conjoint analysis.

147.    Defendants' conduct as described herein was willful and malicious and was designed to maximize Defendants' profits even though Defendants knew that it would cause loss and harm to Plaintiffs and those similarly situated.

.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Plaintiffs' Second Cause of Action**
**(Violation of the Consumers Legal Remedies Act,**
**California Civil Code § 1750, et seq.)**
**On Behalf of Themselves and the California Subclass**

148.    Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

149.    This cause of action is brought pursuant to the California Consumers Legal Remedies Act, California Civil Code § 1750, et seq. ("CLRA").

150.    Defendants' actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale of goods to consumers.

151.    Plaintiffs and other members of the California Subclass are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).

152.    The products that Plaintiffs and similarly situated members of the California Subclass purchased from HP are "goods" within the meaning of California Civil Code § 1761.

153.    By engaging in the actions, representations, and conduct set forth in this Class Action Complaint, Defendants have violated, and continue to violate, §§ 1770(a)(5), 1770(a)(7), and 1770(a)(9) of the CLRA. In violation of California Civil Code §1770(a)(5), Defendants represented that goods have approval, characteristics, uses, benefits, and qualities that they do not have. In violation of California Civil Code §1770(a)(7), Defendants' acts and practices constitute improper representations that the goods and/or services it sells are of a particular standard, quality, or grade, when they are of another. In violation of California Civil Code §1770(a)(9), Defendants advertised goods with intent not to sell them as advertised.

154.    Specifically, Defendants' acts and practices lead consumers to believe that ICBINB Spray has no calories and fat. To the contrary, ICBINB Spray contains significant calories and fat.

155.    Plaintiff requests that this Court enjoin Defendants from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code § 1780(a)(2). If Defendants are not restrained from engaging in these types of practices in the future, Plaintiff and the other members of the California Subclass will continue to suffer harm.

156.    In Plaintiffs original complaint, filed and served more than thirty days prior to the filing of this First Amended Complaint, Plaintiffs provided Defendants with notice and demand that Defendants correct, repair, replace or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein. Further, on May 8, 2013, Plaintiff Kym Pardini (Case No. 13-cv-1675 (N.D.Cal.)) sent via certified mail a notice and demand that Defendants correct, repair, replace or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein.  Despite receiving the aforementioned notices and demands, Defendants failed to do so in that, among other things, they failed to identify similarly situated customers, notify them of their right to correction, repair, replacement or other remedy, and/or to provide that remedy. Accordingly, Plaintiffs seek, pursuant to California Civil Code § 1780(a)(3), on behalf of themselves and those similarly situated class members, compensatory damages, punitive damages and restitution of any ill-gotten gains due to Defendants' acts and practices.

157.    Plaintiffs also request that this Court award them costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

### Plaintiffs' Third Cause of Action
**(False Advertising, Business and Professions Code § 17500, et seq. ("FAL"))**
**On Behalf of Themselves and the California Subclass**

158.    Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

159.    Beginning at an exact date unknown to Plaintiffs, but within three (3) years preceding the filing of the Class Action Complaint, Defendants have made untrue, false, deceptive and/or misleading statements in connection with the advertising and marketing of ICBINB Spray.

160.    Defendants have made representations and statements (by omission and commission) that lead reasonable consumers to believe that ICBINB Spray has no calories. Defendants, however, deceptively failed to inform consumers that ICBINB Spray contains significant calories.

161.    Defendants have made representations and statements (by omission and commission) that lead reasonable consumers to believe that ICBINB Spray has no fat. Defendants,

1   however, deceptively failed to inform consumers that ICBINB Spray contains a significant amount

2   of fat.

3          162.   Plaintiffs and those similarly situated relied to their detriment on Defendants' false,

4   misleading and deceptive advertising and marketing practices. Had Plaintiffs and those similarly

5   situated been adequately informed and not intentionally deceived by Defendants, they would have

6   acted differently by, without limitation, paying less for ICBINB Spray.

7          163.   Defendants' acts and omissions are likely to deceive the general public.

8          164.   Defendants engaged in these false, misleading and deceptive advertising and

9   marketing practices to increase its profits. Accordingly, Defendants have engaged in false

10  advertising, as defined and prohibited by section 17500, et seq. of the California Business and

11  Professions Code.

12         165.   The aforementioned practices, which Defendants have used, and continue to use, to

13  their significant financial gain, also constitute unlawful competition and provide an unlawful

14  advantage over Defendants' competitors as well as injury to the general public.

15         166.   Plaintiffs seek, on behalf of themselves and those similarly situated, full restitution

16  of monies, as necessary and according to proof, to restore any and all monies acquired by

17  Defendants from Plaintiffs, the general public, or those similarly situated by means of the false,

18  misleading and deceptive advertising and marketing practices complained of herein, plus interest

19  thereon.

20         167.   Plaintiffs seek, on behalf of those similarly situated, an injunction to prohibit

21  Defendants from continuing to engage in the false, misleading and deceptive advertising and

22  marketing practices complained of herein. The acts complained of herein occurred, at least in part,

23  within three (3) years preceding the filing of this Class Action Complaint.

24         168.   Plaintiffs and those similarly situated are further entitled to and do seek both a

25  declaration that the above-described practices constitute false, misleading and deceptive

26  advertising, and injunctive relief restraining Defendants from engaging in any such advertising and

27  marketing practices in the future. Such misconduct by Defendants, unless and until enjoined and

28  restrained by order of this Court, will continue to cause injury in fact to the general public and the

loss of money and property in that Defendants will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future customers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendants to which Defendants are not entitled. Plaintiffs, those similarly situated and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

169.    As a direct and proximate result of such actions, Defendants and the other members of the California Subclass have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

<strong><u>Plaintiffs' Fourth Cause of Action</u></strong><br><strong>(Negligent Misrepresentation)</strong><br><strong>On Behalf of Themselves and the California Subclass</strong>

170.    Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

171.    In marketing and selling ICBINB Spray to consumers, Defendants made false and misleading statements that ICBINB Spray has no calories. Defendants, however, deceptively failed to inform consumers that ICBINB Spray has significant calories.

172.    In marketing and selling ICBINB Spray to consumers, Defendants made false and misleading statements that ICBINB Spray has no fat. Defendants, however, deceptively failed to inform consumers that ICBINB Spray contains a significant amount of fat.

173.    These representations were material at the time they were made. They concerned material facts that were essential to the decision of Plaintiffs and those similarly situated regarding how much to pay for ICBINB Spray.

174.    Defendants made identical misrepresentations and omissions to members of the California Subclass regarding ICBINB Spray.

175.    Defendants should have known their representations to be false, and had no

reasonable grounds for believing them to be true when they were made.

176.    By and through such negligent misrepresentations, Defendants intended to induce Plaintiffs and those similarly situated to alter their position to their detriment. Specifically, Defendants negligently induced Plaintiffs and those similarly situated, without limitation, to purchase ICBINB Spray at the price they paid.

177.    Plaintiffs and those similarly situated reasonably relied on Defendants' representations. Specifically, Plaintiffs and those similarly situated paid as much as they did for ICBINB Spray, because Defendants had represented that ICBINB Spray contains no calories and no fat.

178.    Because they reasonably relied on Defendants' false representations, Plaintiffs and those similarly situated were harmed in the amount of the price premium they paid (i.e., the difference between the price consumers paid for ICBINB Spray and the price they would have paid but for Defendants' misrepresentations), in an amount to be proven at trial using econometric or statistical techniques such as hedonic regression or conjoint analysis.

**Plaintiffs' Fifth Cause of Action**
**(Unfair, Unlawful and Deceptive Trade Practices,**
**Business and Professions Code § 17200, et seq.)**
**On Behalf of Themselves and the California Subclass**

179.    Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

180.    Within four (4) years preceding the filing of this Class Action Complaint, and at all times mentioned herein, Defendants have engaged, and continue to engage, in unfair, unlawful and deceptive trade practices in California by carrying out the unfair, deceptive and unlawful business practices outlined in this Class Action Complaint. In particular, Defendants have engaged, and continue to engage, in unfair, unlawful and deceptive trade practices by, without limitation, the following:

a. choosing to use the incorrect serving sizes of one spray and five sprays to calculate the amount of fat and calories to use on the ICBINB Spray label;

b. failing to use the one-tablespoon serving size required by FDA regulations for the ICBINB Spray label;

c. failing to use the proper FDA subcategory for ICBINB Spray—"Butter, margarine, oil and shortening."

d. ignoring the fact that when consumers use ICBINB Spray, they use many sprays (typically, 10-40 sprays);

e. choosing to make claims regarding the transfat and calorie content of ICBINB Spray on the front label without also including a statement of identity identifying vegetable oil as ICBINB Spray's characterizing ingredient;

f. failing to disclose in simple and direct terms the basic nature of ICBINB Spray;

g. failing to include the percentage of vegetable oil on the front label of ICBINB Spray in conspicuous print and in distinct contrast to other printed or graphic material;

h. failing to include a statement denoting the presence of vegetable oil as a characterizing ingredient of ICBINB Spray;

e. falsely representing to Plaintiffs and those similarly situated that ICBINB Spray contains no calories;

f. falsely representing to Plaintiffs and those similarly situated that ICBINB Spray contains no fat;

g. failing to inform Plaintiffs and those similarly situated that ICBINB Spray contains significant calories;

h. failing to inform Plaintiffs and those similarly situated that ICBINB Spray contains significant fat;

i. engaging in misrepresentation as described herein;

j. violating 21 C.F.R. part 101, including §§ 101.9, 101.12, 101.13,  and 101.3;

k. violating 21 C.F.R. part 102, including § 102.5;

l. violating 21 C.F.R. 1.21;

m. violating California Health & Safety Code §§ 110390, 110395, 110398 and 110400;

n. violating the misbranded food provisions of the Sherman Law (Article 6), including without limitation, California Health & Safety Code §§ 110660, 110665, 110705, 110740, 110760, 110765, and 110770;

o. violating federal laws regulating the advertising and branding of food in 21 U.S.C. § 343(a), et seq. and FDA regulations, including but not limited to 21 C.F.R. 101.3, 101.4, 101.13, 101.14, and 101.22, which are incorporated into the Sherman Law (California Health & Safety Code §§ 110100(a), 110380, and 110505);

p. violating the CLRA as described herein; and

q. violating the FAL as described herein.

181.    Plaintiffs and those similarly situated relied to their detriment on Defendants' unfair, deceptive and unlawful business practices. Had Plaintiffs and those similarly situated been adequately informed and not deceived by Defendants, they would have acted differently by, without limitation, paying less for ICBINB Spray.

182.    Defendants' acts and omissions are likely to deceive the general public.

183.    Defendants engaged in these unfair practices to increase their profits. Accordingly, Defendants have engaged in unlawful trade practices, as defined and prohibited by section 17200, et seq. of the California Business and Professions Code.

184.    The aforementioned practices, which Defendants have used to their significant financial gain, also constitute unlawful competition and provides an unlawful advantage over Defendants' competitors as well as injury to the general public.

185.    As a direct and proximate result of such actions, Plaintiffs and the other members of the California Subclass have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive, unfair and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. Among other things, Plaintiff and the class lost the amount of the price premium they paid (i.e., the difference between the price consumers paid for ICBINB Spray and the price they would have paid but for Defendants' misrepresentations), in an amount to be proven

1   at trial using econometric or statistical techniques such as hedonic regression or conjoint analysis;

2        186.    Plaintiffs seek, on behalf of those similarly situated, a declaration that the above-

3   described trade practices are fraudulent and unlawful.

4        187.    Plaintiffs seeks, on behalf of those similarly situated, an injunction to prohibit

5   Defendants from offering ICBINB Spray within a reasonable time after entry of judgment, unless

6   the Defendant modifies its website and other marketing materials to remove the misrepresentations

7   and to disclose the omitted facts. Such misconduct by Defendants, unless and until enjoined and

8   restrained by order of this Court, will continue to cause injury in fact to the general public and the

9   loss of money and property in that Defendants will continue to violate the laws of California,

10  unless specifically ordered to comply with the same. This expectation of future violations will

11  require current and future consumers to repeatedly and continuously seek legal redress in order to

12  recover monies paid to Defendants to which Defendants were not entitled. Plaintiffs, those

13  similarly situated and/or other consumers have no other adequate remedy at law to ensure future

14  compliance with the California Business and Professions Code alleged to have been violated

15  herein.

16                    **Plaintiffs' Sixth Cause of Action**
                       **(Unjust Enrichment)**
17           **On Behalf of Themselves and the Class**

18       188.    Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action

19  Complaint as if set forth herein.

20       189.    Plaintiffs and the Class members conferred a benefit on the Defendants by

21  purchasing ICBINB Spray.

22       190.    Defendants have been unjustly enriched in retaining the revenues from Class

23  members' purchases of ICBINB Spray, which retention under these circumstances is unjust and

24  inequitable because Defendants falsely represented that ICBINB Spray had no calories and no fat,

25  which caused injuries to Plaintiffs and Class members because they paid a price premium due to

26  the mislabeling of ICBINB Spray.

27       191.    Because Defendants' retention of the non-gratuitous benefit conferred on them by

28  Plaintiffs and Class members is unjust and inequitable, Defendants must pay restitution to Plaintiffs

1   and the Class members for their unjust enrichment, as ordered by the Court.

2       192.    Plaintiffs, therefore, seek an order requiring Defendants to make restitution to them

3   and other members of the Class.

4

5                           **VII.    PRAYER FOR RELIEF**

6       WHEREFORE, Plaintiffs, individually and on behalf all others similarly situated,

7   respectfully requests that this Court enter a judgment against Defendants and in favor of Plaintiffs,

8   and grant the following relief:

9       A.    Determine that this action may be maintained as a Class action with respect to the

10  Class identified herein and certify it as such under Rules 23(b)(2) and 23(b)(3), or alternatively

11  certify all issues and claims that are appropriately certified, and designate and appoint Plaintiffs as

12  Class Representatives and their counsel as Class Counsel;

13      B.    Declare, adjudge and decree the conduct of the Defendant as alleged herein to be

14  unlawful, unfair and/or deceptive;

15      C.    Enjoining Defendants, directly or through any corporation, partnership, subsidiary,

16  division, trade name, or other device, in connection with the manufacturing, labeling, packaging,

17  advertising, promotion, offering for sale, sale, or distribution of any margarine or butter substitute,

18  from omitting a statement of identity that complies with 21 C.F.R 102.5 where Defendants also

19  make a claim regarding the nutritional contents of the product.

20      D.    Enjoining Defendants, directly or through any corporation, partnership, subsidiary,

21  division, trade name, or other device, in connection with the manufacturing, labeling, packaging,

22  advertising, promotion, offering for sale, sale, or distribution of any margarine or butter substitute,

23  from making a claim that the product has zero calories and/or zero fat unless such measurement

24  comports with the serving size requirements for butter or margarine products set forth in 21 C.F.R.

25  § 101.12(b) and/or, at the time the representation is made, Defendants possess and rely upon

26  competent and reliable evidence, that, when considered in light of the entire body of relevant and

27  reliable evidence, is sufficient in quantity and quality based on standards generally accepted in the

28  relevant fields to substantiate that the serving size is of an amount customarily used by consumers

of the product in question. For the purposes of this paragraph, "competent and reliable evidence" means tests, analyses, research, studies, or other evidence based on the expertise of professionals in the relevant area, that have been conducted and evaluated in an objective manner by qualified persons, using procedures generally accepted in the profession to yield accurate and reliable results.

E.      Enjoining Defendants, directly or through any corporation, partnership, subsidiary, division, or other device, in connection with the manufacturing, labeling, packaging, advertising, promotion, offering for sale, sale, or distribution of any margarine or butter substitute, to not provide to others the means and instrumentalities with which to make any representation prohibited by Paragraphs C and D above. For the purposes of this paragraph, "means and instrumentalities" means any information, including, but not necessarily limited to, any advertising, labeling, or promotional, sales training, or purported substantiation materials, for use by trade customers in their marketing of such product or service.

F.      Award Plaintiffs and the Class actual, compensatory damages, as proven at trial;

G.      Award Plaintiffs and the Class restitution of all monies paid to Defendants as a result of unlawful, deceptive, and unfair business practices;

H.      Award Plaintiffs and the Class exemplary damages in such amount as proven at trial;

I.      Award Plaintiffs and the Class reasonable attorneys' fees, costs, and pre- and post-judgment interest; and

J.      Award Plaintiffs and the Class such other further and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

## VIII.   JURY TRIAL DEMAND

Plaintiffs, by counsel, request a trial by jury on their legal claims, as set forth herein.

1

DATED: January 11, 2019                    GUTRIDE SAFIER LLP

2

3                                           By /s/ Kristen Simplicio

4                                           Adam J. Gutride
                                            Anthony Patek
5                                           Kristen Simplicio
                                            100 Pine Street, Suite 1250
6                                           San Francisco, California 94111
                                            Telephone: (415) 639-9090
7                                           Facsimile:  (415) 449-6469
                                            adam@gutridesafier.com
8                                           anthony@gutridesafier.com
                                            kristen@gutridesafier.com
9

10

11                                          Ureka Idstrom (*Pro Hac Vice*)
                                            THE EUREKA LAW FIRM
12                                          5606 Belinder Road
                                            Fairway, KS 66205
13                                          Telephone:  (816) 665-3515
                                            uidstrom@eurekalawfirm.com
14

15                                          *Attorneys for Plaintiffs and the Proposed Class*

16

17

18

19

20

21

22

23

24

25

26

27

28